**Pamela E. MOSS, Plaintiff,**

v.

**COMMISSIONER OF SOCIAL SECURITY, Defendant.**

No. 01–2393–DJW.

United States District Court, D. Kansas.

Feb. 28, 2003.

Joan H. Deans, J.H. Deans Law Office, Raytown, MO, for Plaintiff.

Melanie D. Caro, David D Zimmerman, Office of United States Attorney, Kansas City, KS, for Defendant.

### MEMORANDUM AND ORDER

WAXSE, United States Magistrate Judge.

This is an action for judicial review of a final decision of Defendant Commissioner of Social Security denying Plaintiff's claim for a period of disability, disability insurance benefits and Supplemental Security Income under Title II and Title XVI of the Social Security Act, as amended.[1] Currently pending before the Court is Plaintiff's Motion for Judgment (doc. 12).

### I. Procedural History

On June 12, 1996, Plaintiff Pamela E. Moss filed her applications for disability benefits seeking a period of disability, disability benefits and Supplemental Security Income commencing February 14, 1997 (amended onset date). Plaintiff's applications were denied initially and upon reconsideration. On October 29, 1997, an administrative hearing was held at Plaintiff's request before Administrative Law Judge Keith W. Sickendick (ALJ). The ALJ entered a decision on February 9, 1998, finding that Plaintiff was not entitled to a period of disability, disability insurance benefits or Supplemental Security Income. On February 27, 1998, Plaintiff requested a review of that hearing decision by the Appeals Council. Additional evidence was received by the Appeals Council and made part of the record. On November 5, 1999, the request for review was denied, thereby rendering the ALJ's decision the final decision of the Commissioner.

On December 27, 1999, Plaintiff filed a lawsuit pursuant to 42 U.S.C. § 405(g) seeking judicial review of the Commissioner's decision. On June 7, 2000, Defendant Commissioner moved to have the case remanded back to the ALJ for further consideration. This Court granted Defendant's Motion on June 9, 2000. On August 7, 2000, the Appeals Council remanded the case directing the ALJ to reevaluate Plaintiff's impairments under the Listing of Impairments, reevaluate Plaintiff's educational level, obtain the testimony of a vocational expert and provide Plaintiff the opportunity to appear at the hearing.

---

1. 42 U.S.C. §§ 401 et seq.; 42 U.S.C. §§ 1381 et seq.

On January 10, 2000, during the pendency of her claims in the United States District Court for the District of Kansas, Plaintiff filed new applications for a period of disability, disability insurance benefits and Supplemental Security benefits. These applications were denied initially and upon reconsideration.

On November 7, 2000, an administrative hearing was held to consider both the remanded claims and the new claims. The ALJ entered a decision on May 30, 2001, finding that Plaintiff was not entitled to a period of disability, disability insurance and Supplemental Security Income. This became the final decision of the Commissioner following expiration of the statutory time period.

## II. *Facts*

### *General*

- Plaintiff was born on April 12, 1962 and completed formal education through the tenth grade. (Tr. 38, 297).
- Plaintiff's past relevant work includes working as a cosmetologist, a hair dresser, a daycare worker, a cashier and a house cleaner. (Tr. 84, 221).
- Plaintiff's work history is sporadic with below average earnings. (Tr. 21).

### *Medical Treatment*

- In April 1996, Plaintiff presented to the hospital emergency room with a chief complaint of chest pain over the past two months. Although Plaintiff successfully completed an exercise stress test with no chest pain (Tr. 405), she was admitted to the hospital and subsequently underwent a left heart catheterization and angioplasty (Tr. 398–99).
- In May 1996, a cardiovascular examination was "normal" and an EKG showed "normal" sinus rhythm (Tr. 430).

- On June 8, 1996, Plaintiff presented to the hospital emergency room with a complaint of burning sensation in her chest. Plaintiff underwent an thallium exercise stress test, which she performed for 7 minutes and 30 seconds without chest pain. Plaintiff was discharged on June 11, 1996, with a diagnosis of chest pain, "probably noncardiac." (Tr. 431).
- On June 14, 1996, Plaintiff was admitted to the hospital to undergo elective cardiac catheterization. (Tr. 445). Plaintiff was discharged with a diagnosis of "atypical chest pain of noncardiac origin." (Tr. 446).
- In July and September 1996, Plaintiff had regular heart rate and rhythm and there was no edema (Tr. 465–66). An exercise test was "negative" and there was no chest discomfort or evidence of exercise induced arrhythmia (Tr. 468).
- In December 1996, Plaintiff had normal heart sounds, no pedal edema, and was neurologically "unremarkable." (Tr. 458–59).
- On July 11, 1997, Plaintiff presented to the hospital emergency room with a complaint of chest pain. Plaintiff ultimately was admitted and an angiogram was administered. "[M]ild" coronary disease was noted. Plaintiff underwent cardiac catheterization and was discharged on July 13, 1997 with a diagnosis of chest pain and poorly controlled diabetes. (Tr. 502, 503).
- In late July 1997, Plaintiff's treating physician noted that Plaintiff's "occasional mild" chronic chest discomfort was "nondiagnostic and not strongly suggestive of angina." (Tr. 515).
- On January 20, 1998, Plaintiff went to the hospital with a complaint of chest pain. An exercise stress test was administered, during which no evidence of angina, arrhythmia or hypertension

was observed. The next day, Plaintiff underwent cardiac catheterization. (Tr. 692–698).

- A January 1998 EKG was "normal" (Tr. 687) and a stress test was "negative" for evidence of inducible ischemic (Tr. 696–97).

- In November 1999, Plaintiff had "regular" heart rhythm and "normal" first and second heart sounds with no murmur or rub and "minimal" edema (Tr. 607).

- In December 1999, Plaintiff had "regular" heart rate and rhythm, no murmurs, no clubbing, no cyanosis and no edema (Tr. 591). The EKG was "normal" and there was no evidence of ischemic or infarction (Tr. 591, 594–95).

- In May 2000, Plaintiff was not having any angina, a cardiovascular examination revealed "regular" rhythm and normal first and second heart sounds and no edema (Tr. 821).

### Walking

- Plaintiff consistently has "normal" gait in her walking. (Tr. 542, 635, 642, 734, 738, 743, 777, 786, 817, 833, 892).

- In January 2001, examination of Plaintiff revealed "normal" stride and stance and "normal" heel, toe and tandem walking (Tr. 890–892).

### Diabetes

- Plaintiff was noncompliant with prescribed treatment for diabetes, despite physician's statements that uncontrolled diabetes would worsen her cardiac condition (Tr. 503). She did not take her insulin in April 1997 (Tr. 494).

- It was noted in September 1997 that Plaintiff "rarely" checked her sugar levels (Tr. 541).

- In April 1999, notes from the Diabetes Clinic at the University of Kansas Medical Center indicate that Plaintiff had dietary problems (Tr. 654).

- Plaintiff repeatedly was advised to lose weight in order to control her diabetes, but Plaintiff reported that she did not closely follow her diet, she did not count calories and she had a high fat intake. (Tr. 657–58, 660, 689, 700, 708, 774, 808, 813, 815).

- In May 2000, Plaintiff reported that she had not checked her sugar levels in the past week. (Tr. 801).

### Heart Condition

- As of October 1997, Plaintiff testified she has never experienced an unusual heart beat—either too fast or too slow. (Tr. 315).

- Plaintiff denied difficult or labored breathing upon physical exertion in general or in circumstances such as climbing fourteen steps (Tr. 429, 458).

- Although Plaintiff became "mildly" short of breath with walking, it "seemed to come and go without pattern" related to anything physiological (Tr. 892).

- Plaintiff's lungs and chest repeatedly appear clear and her respiratory effort repeatedly appears normal. (Tr. 446, 466, 515, 542, 591, 599, 604, 610, 618, 623, 628, 630–31, 641, 644, 651, 656, 660–61, 665, 669, 687, 701, 704, 713, 718, 722, 724, 732–33, 745, 747, 750, 774, 776, 778, 781, 794, 821, 887, 891).

- Plaintiff's cardiac condition frequently was noted as "stable" from 1996 to 2000. (Tr. 465, 541–42, 606–07, 630, 636, 643, 724, 726, 732, 735, 739, 745, 752, 53, 787, 791) and there is some indication that Plaintiff's chest discomfort is noncardiac in origin (Tr. 431, 592).

*Activities*

- The only restrictions imposed by any physician upon Plaintiff is a restriction against lifting over 20 pounds; no doctor has restricted Plaintiff from work. (Tr. 81–82). Plaintiff repeatedly has been advised to exercise and increase her physical activity (Tr. 643, 650, 689, 708).

- Plaintiff cleans (Tr. 52), travels to visit family on the weekends (Tr. 60), reads (Tr. 39), mops (Tr. 51), rides the bus to the soup kitchen every day without difficulty (Tr. 48, 51, 64), goes grocery shopping (Tr. 48), cooks (Tr. 49, 878), does laundry (Tr. 878), watches television (Tr. 64) and sews (Tr. 64, 68).

- Plaintiff has a current driver's license, but does not drive regularly because she cannot afford to keep her car (Tr. 40, 47, 878).

- Plaintiff can climb 14 steps without chest discomfort or shortness of breath (Tr. 46, 458). Plaintiff lives in a two story house and sleeps on the second floor. Plaintiff attends community college in an effort to obtain her GED (Tr. 41, 788). Plaintiff uses public transportation everyday to go to the food pantry and walks half a block uphill and half a block downhill daily.

- Plaintiff states she needs to nap daily and recline with her feet elevated by pillows twice weekly (Tr. 64–65, 92–93). Plaintiff has not ever informed her physicians of this alleged need. (Tr. 93). Plaintiff's physicians repeatedly advised her to exercise and increase her physical activity (Tr. 643, 650, 689, 708).

*Medications/Prescriptions*

- Plaintiff reports she sometimes uses a cane to walk, but no physician has ever prescribed a cane. (Tr. 53). Plaintiff's gait never showed any abnormalities during examination (Tr. 405, 420, 468, 542, 635, 642, 734, 738, 743, 777, 786, 817, 833, 892).

- Plaintiff testified that nitroglycerine "almost always" worked within a "couple" of minutes to relieve her chest discomfort and the medical records support this testimony. (Tr. 61, 497, 502, 541, 601).

- Plaintiff alleges the nitroglycerin ills caused headaches, but states the headaches usually last only two to three minutes. (Tr. 86).

- Although Plaintiff states using the nitroglycerin patch causes "all-day" headaches once or twice weekly, the headaches do not restrict her from activities like going out to lunch—she only needs to wear sunglasses (Tr. 87).

## III. *ALJ Findings*

1. The claimant met the special earnings requirements of the Act on February 14, 1997, and continued to meet them through the date of this decision.

2. The claimant has not engaged in substantial gainful activity since February 14, 1997.

3. The medical evidence establishes that the claimant has the following severe impairments: coronary artery disease, insulin dependent diabetes mellitus, diabetic retinopathy and neuropathy, hypertension, is status post three angioplasties, has diabetic nephropathy, a hiatal hernia and headaches. Nevertheless, she does not have an impairment or combination of impairments listed in, or medically equal to one listed in 20 C.F.R. part 404, Appendix 1, Subpart P.

4. The claimant's testimony is not found credible when considered in light of the medical signs and findings, history of medical treatment,

reports of treating and examining physicians and the inconsistencies in the claimant's testimony.

5. From the alleged onset date the claimant's medically determinable impairments were of such severity to prevent her from lifting more than 10 pounds maximum or repeatedly; climbing ropes, ladders or scaffolds; climbing ramps or stairs more than occasionally; stooping, twisting, squatting, kneeling or crawling more than occasionally; using foot controls repetitively; she should avoid exposure to concentrated heat, humidity or cold, dust, fumes and smoke; she should avoid working at unprotected heights or around hazardous moving machinery; should be able to change from a seated to standing position every 30 minutes; and she is limited to simple, routine, repetitive work.

6. The claimant is unable to perform her past relevant work.

7. The claimant is a younger individual and has a limited education.

8. The claimant has no acquired work skills that are transferable to semi-skilled or skilled work functions of other work within her residual functional capacity.

9. After considering the claimant's above-described residual functional capacity for a range of work and age, education and past relevant work, the undersigned Administrative Law Judge is persuaded that the claimant would be able to make a vocational adjustment to work which exists in significant numbers in the local and national economies.

10. The claimant has not been under a "disability," as defined in the Social Security Act, as amended, since February 14, 1997 and through the date of this decision.

## IV. *Standard of Review*

 The ALJ's decision is binding on the court if supported by substantial evidence.[2] The court must determine whether the record contains substantial evidence to support the decision and whether the ALJ applied the proper legal standards.[3] While "more than a mere scintilla," substantial evidence is only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[4] The court must scrutinize the record and take into account any evidence that fairly detracts from evidence supporting the Secretary's findings.[5] Evidence is not substantial "if it is overwhelmed by other evidence—particularly certain types of evidence (e.g., that offered by treating physicians) or if it really constitutes not evidence but mere conclusion."[6] A finding of no substantial evidence will be found "only where there is a conspicuous absence of credible choices or no contrary medical evidence."[7]

 The court may neither reweigh the evidence nor substitute its discretion for that of the Commissioner.[8] At the same

---

**2.** 42 U.S.C. § 405(g); *Dixon v. Heckler*, 811 F.2d 506, 508 (10th Cir.1987).

**3.** *Castellano v. Sec'y of HHS*, 26 F.3d 1027, 1028 (10th Cir.1994).

**4.** *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *Miller v. Chater*, 99 F.3d 972, 975 (10th Cir.1996).

**5.** *Nieto v. Heckler*, 750 F.2d 59 (10th Cir. 1984).

**6.** *Knipe v. Heckler*, 755 F.2d 141, 145 (10th Cir.1985) (quotation omitted).

**7.** *Burkett v. Callahan*, 978 F.Supp. 1428, 1429 (D.Kan.1997) (quoting *Trimiar v. Sullivan*, 966 F.2d 1326, 1329 (10th Cir.1992)).

**8.** *Qualls v. Apfel*, 206 F.3d 1368, 1371 (10th

time, however, the findings of the Commissioner should not be mechanically accepted.[9] The court may not affirm the Commissioner's findings by isolating facts and labeling them substantial evidence, and the court must scrutinize the entire record to determine whether the Commissioner's conclusions are rational.[10] "In applying these standards, the court must keep in mind that the purpose of the Social Security Act is to ameliorate some of the rigors of life for those who are disabled or impoverished."[11]

## V. Analysis

The Social Security Administration defines "disability" as the inability to engage in substantial gainful activity for at least twelve months due to a medically determinable impairment.[12] A five-step sequential process is used in evaluating a claim of disability[13]:

> Step one is whether the claimant is currently engaged in substantial gainful activity. If claimant is not, the fact finder in step two decides whether the claimant has a medically severe impairment or combination of impairments. Step three entails looking at whether the impairment is equivalent to one of a number of listed impairments that the Commissioner acknowledges are so severe as to preclude substantial gainful activity. If no equivalency, step four requires the

claimant to show that because of the impairment he is unable to perform his past work. The final step is to determine whether the claimant has the residual functional capacity ("RFC") to perform other work available in the national economy, considering such additional factors as age, education, and past work experience.[14]

If the claimant fails at any of the steps in which he or she bears the burden of proof, consideration of any subsequent steps is rendered unnecessary.[15] The claimant bears the burden of proof at steps one through four, while the Commissioner bears the burden at step five.[16] If a claimant satisfies steps one, two and three, she is disabled; if a claimant satisfies steps one and two, but not three, then she must satisfy step four. If she satisfies step four, the burden shifts to the Commissioner to establish that the claimant is capable of performing work in the national economy.[17]

In this case, the ALJ denied benefits at step five, finding Plaintiff has the residual functional capacity to perform other work available in the national economy with the following restrictions: she cannot lift more than 10 pounds maximum or repeatedly; she cannot climb ropes, ladders or scaffolds; she cannot climb ramps or stairs more than occasionally; she cannot stoop, twist, squat, kneel or crawl more than

---

Cir.2000) (citing *Casias v. Secretary of Health & Human Servs.*, 933 F.2d 799, 800 (10th Cir.1991)).

9. *Ortiz v. Apfel*, 39 F.Supp.2d 1275, 1281 (D.Kan.1998).

10. *Id.*

11. *Owen v. Chater*, 913 F.Supp. 1413, 1418–19 (D.Kan.1995) (citing *Dvorak v. Celebrezze*, 345 F.2d 894, 897 (10th Cir.1965)).

12. 42 U.S.C.A. § 423(d)(1)(A).

13. *Bowen v. Yuckert*, 482 U.S. 137, 140, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987).

14. *Anderson v. Apfel*, 100 F.Supp.2d 1278, 1281 (D.Kan.2000) (quotations and citations omitted); *see, also,* 20 C.F.R. §§ 404.1520, 416.920 (1996).

15. *Burnett v. Shalala*, 883 F.Supp. 565, 567 (D.Kan.1995).

16. *Id.*

17. *Williams v. Bowen*, 844 F.2d 748, 751 (10th Cir.1988).

occasionally; she cannot use foot controls repetitively; she should avoid exposure to concentrated heat, humidity or cold, dust, fumes and smoke; she should avoid working at unprotected heights or around hazardous moving machinery; she should be able to change from a seated to standing position every 30 minutes; and she is limited to simple, routine, repetitive work. In making this determination, the ALJ discounted Plaintiff's credibility with regard to her subjective complaints of disabling conditions.

Plaintiff challenges the ALJ's determination on three grounds. First, Plaintiff argues the ALJ improperly determined Plaintiff's impairment did not meet or equal the 4.04(C)(1)(d) and 4.04(C)(2) Listing (Coronary Artery Disease). Second, Plaintiff argues the ALJ failed to make proper credibility findings with respect to Plaintiff's subjective complaints. Finally, Plaintiff argues the ALJ erred in finding Plaintiff has the ability to perform other work in the national economy. The Court will address each of Plaintiff's allegations of error in turn.

## A. Listing 4.04(C)(1)(d) and (C)(2)

Step three of the five-step disability evaluation process provides that if the claimant is not currently engaged in substantial gainful activity and has a medically severe impairment, the fact finder must determine whether the impairment meets or is equivalent to one of a number of impairments listed in the regulations published by the Social Security Administration.[18] If the impairment meets or is equivalent to one of the "listed" impairments, then the fact finder—without con-

sidering the claimant's age, education or past work experience—automatically must make a finding that the claimant lacks the residual functional capacity to work.

It is the claimant who has the burden of proving that her impairment or combination of impairments meets or equals the Listings.[19] To *meet* a listed impairment, the claimant's medical findings (i.e., symptoms, signs and laboratory findings) must match those described in the listing for that impairment.[20] To *equal* a listing, the claimant's medical finding must be "at least equal in severity and duration to the listed findings."[21] Determinations of equivalence must be based on medical evidence only and must be supported by medically acceptable clinical and laboratory diagnostic techniques.[22]

Part 404, Subpart P, Appendix One of Title 20 of the Code of Federal Regulations sets forth the Listing of Impairments. Section 4.04(C) within the Listing of Impairments addresses the specific impairment of coronary heart disease claimed by Plaintiff, which—relevant to Plaintiff's claim—requires Plaintiff to establish a "50 percent or more narrowing of at least 2 nonbypassed coronary arteries" resulting in "marked limitation of physical activity, as demonstrated by fatigue, palpitation, dyspnea, or anginal discomfort on ordinary physical activity, even though the individual is comfortable at rest."[23]

The ALJ found Plaintiff's condition failed to meet the criteria listed based on his finding that "the claimant does not have the severe fatigue or shortness of breath required by listing 4.04(C)(2). Her impairments are not of at least equal med-

---

**18.** *Bowen v. Yuckert,* 482 U.S. 137, 140, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987).

**19.** 20 C.F.R. § 404.1520(d).

**20.** 20 C.F.R. §§ 404.1525(d), 404.1528.

**21.** 20 C.F.R. § 404.1526(a).

**22.** 20 C.F.R. § 404.1526(b).

**23.** 20 C.F.R. Part 404, Subpart P, Appendix One, Section 4.04(C)(1)(d) and (C)(2).

ical significance to those that are contained in the listed impairment nor are the functional limitations resulting from her impairment the same as the disabling functional consequences of a listed impairment." [24]

Plaintiff disagrees with the ALJ, arguing her cardiac condition meets or equals a listed impairment at 20 C.F.R. Part 404, Subpart P, Appendix One, Section 4.04(C)(1)(d). In support of her argument, Plaintiff states medical records demonstrate Plaintiff had the requisite "50 percent or more narrowing of at least 2 nonbypassed coronary arteries" resulting in "marked limitation of physical activity, as demonstrated by fatigue, palpitation, dyspnea, or anginal discomfort on ordinary physical activity, even though the individual is comfortable at rest." More specifically, Plaintiff refers the Court to medical records from Plaintiff's July 1997 hospitalization (Tr. 292–94, 502) and from Plaintiff's January 1998 hospitalization (Tr. 668, 692–93).

Upon review of the referenced citations within the transcript, the Court finds Plaintiff's allegations of "fatigue, palpitation, dyspnea, or anginal discomfort on ordinary physical activity, even though ... comfortable at rest" are not supported by the documents to which Plaintiff cites in the record. Transcript pages 292 through 294 reflect a dialogue between Plaintiff's attorney and the ALJ about the 4.04 Listing requirements and the attorney's uncertainty regarding whether Plaintiff could take an exercise test. There is no reference to Plaintiff experiencing fatigue (extreme tiredness), palpitation (abnormally rapid or violent beating of the heart), dyspnea (difficult or labored breathing) or anginal discomfort on ordinary physical activity.

Transcript pages 502 through 504 cited by Plaintiff, which are the records from Plaintiff's July 1997 hospitalization, reveal only that

- Plaintiff was admitted to the hospital on July 11, 1997 for chest pain;
- Plaintiff had a cardiac history with three angioplasties (most recent in 1996);
- Plaintiff experienced chest pain on July 9, 1997, which lasted nine hours and ultimately was relieved with the intake of repeated nitroglycerin pills;
- Plaintiff experienced the return of these chest pains while she was resting on July 10, 1997; such chest pains were less severe than the day before but were accompanied by shortness of breath, as well as radiating pain in her neck and left arm; and
- Plaintiff had no further chest pain or shortness of breath after the angiography administered by the hospital.

There is no mention in these records of reported extreme tiredness, abnormal rapid or violent beating of the heart, difficult or labored breathing or anginal discomfort upon ordinary physical activity. Although Plaintiff did report she experienced shortness of breath, it specifically was reported to have occurred while she was resting and not upon ordinary physical activity.

Transcript page 668–71 cited by Plaintiff are records dated March 18, 1999 reflecting the results of a General Multi–System examination given to Plaintiff. These records reflect

- Plaintiff's complaints regarding rib area soreness due to repeated coughing;
- Plaintiff's medical history of diabetes;
- Plaintiff's assertion of tiredness;
- A description of Plaintiff's general appearance as alert and cheerful; and

---

**24.** May 30, 2001 ALJ Decision (Tr. 15–24) at p. 3.

• Lungs, heart and pulse were all normal and there was no evidence of edema. Although these records reflect Plaintiff's assertion of tiredness, the records do not reflect whether or not she is tired when she is resting or whether she becomes tired upon ordinary physical activity.

Transcript pages 692–93 cited by Plaintiff are records from Plaintiff's January 1998 hospitalization, at which time a cardiac catheterization was performed upon Plaintiff. Although these records reflect findings of a 50 percent or more narrowing of at least 2 nonbypassed coronary arteries, these records do not touch upon issues of physical activity, fatigue, rate of heart beat, breathing effort or anginal comfort. The Court acknowledges that Transcript pages 696–97 reflect assertions by Plaintiff of fatigue, shortness of breath and leg pain, but this was in the context of an exercise stress test administered by the hospital and not in the context of ordinary physical activity as set forth in the regulations. .

Although not cited by Plaintiff, there are numerous documents within the record that support a finding Plaintiff *does not* experience extreme tiredness, abnormally rapid or violent beating of the heart, difficult or labored breathing or anginal discomfort upon ordinary physical activity. For example, in October 1997, Plaintiff testified she has never experienced an unusual heart beat—either too fast or too slow. (Tr. 315). On numerous occasions in 1997, Plaintiff denied difficult or labored breathing upon physical exertion in general or in circumstances such as climbing fourteen steps (Tr. 458). In January 2001, Plaintiff also denied difficult or labored breathing related to chest discomfort (Tr. 885). Dr. Linda Johnson noted that, although Plaintiff became "mildly" short of breath with walking, it seemed to come and go without pattern entirely related to anything physiological (Tr. 892). Plaintiff's lungs and chest repeatedly appear clear and her respiratory effort repeatedly appears normal. (Tr. 446, 466, 515, 542, 591, 599, 604, 610, 618, 623, 628, 630–31, 641, 644, 651, 656, 660–61, 665, 669, 687, 701, 704, 713, 718, 722, 724, 732–33, 745, 747, 750, 774, 776, 778, 781, 794, 821, 887, 891). The evidence in this case fails to indicate marked limitation of physical activity in daily activities or otherwise. Notably, Plaintiff's allegations that she needs a nap is not based upon any determination by a treating or examining physician that this was medically necessary; in fact, Plaintiff repeatedly has been advised to increase her physical activity. (Tr. 643, 650, 689, 708).

█ Based on the record presented, the Court finds the ALJ properly determined Plaintiff's impairment did not meet or equal the 4.04(C)(1)(d) and 4.04(C)(2) Listing (Coronary Artery Disease).

**B. Credibility**

█ The Tenth Circuit has set forth the following factors for analyzing subjective complaints of disabling conditions: (1) whether claimant proves with objective medical evidence an impairment that causes the subjective condition; (2) whether a loose nexus exists between the impairment and the subjective condition; and (3) whether the subjective condition is disabling based on all objective and subjective evidence.[25] If Plaintiff satisfies the first two factors, the ALJ must consider Plaintiff's assertions regarding subjective conditions and decide whether he believes them.[26] In determining the credibility of Plaintiff's testimony, the ALJ should con-

---

**25.** *Glass v. Shalala,* 43 F.3d 1392, 1395 (10th Cir.1994); *Luna v. Bowen,* 834 F.2d 161, 163–64 (10th Cir.1987).

**26.** *See Luna,* 834 F.2d at 163.

sider such factors as the levels of medication and their effectiveness, the extent to which Plaintiff attempts to obtain relief, the frequency of medical contacts, the nature of daily activities, subjective measures of credibility that are peculiarly within the judgment of the ALJ, the motivation of and relationship between the claimant and other witnesses and the consistency or compatibility of nonmedical testimony with objective medical evidence.[27]

■ In reviewing a credibility determination, the court should "defer to the ALJ as trier of fact, the individual optimally positioned to observe and assess witness credibility."[28] Credibility is the province of the ALJ.[29] At the same time, the ALJ must explain why specific evidence relevant to each factor supports a conclusion that a claimant's subjective complaints are not credible.[30] Findings as to credibility should be closely linked to substantial evidence and not just a conclusion in the guise of findings.[31]

■ Utilizing the *Luna* factors, the ALJ found objective medical evidence to demonstrate that Plaintiff has an impairment and that a loose nexus exists between her impairment and the subjective condition of which she complains. Because Plaintiff satisfied the first two factors, the ALJ then went on to consider Plaintiff's assertions regarding her subjective condition to determine if they were credible. Upon such consideration, the ALJ determined Plaintiff's testimony was not credible when

considered in light of the medical signs and findings, history of medical treatment, reports of treating and examining physicians and the inconsistencies in Plaintiff's testimony. For the reasons set forth below, the Court finds substantial evidence supports the ALJ's conclusion.

### Levels of Medication and Their Effectiveness

Plaintiff testified that nitroglycerine "almost always" worked within a "couple" of minutes to relieve her chest discomfort and the medical records support this testimony. There is no indication in the record that Plaintiff's medications were not efficacious when taken as prescribed. The fact that Plaintiff's medication provides relief is inconsistent with a disabling impairment.[32]

Moreover, there has been no observation or notation by any treating or examining medical professional of record that the Plaintiff experienced any adverse side effects to medication. Although Plaintiff states the nitroglycerin pills often cause headaches, she states the headaches usually lasted only two to three minutes. And, although Plaintiff states using the nitroglycerin patch caused "all day" headaches once or twice weekly, Plaintiff goes on to state that she was not so restricted that she could not go out—she need only wear sunglasses.

### Attempts to Obtain Relief

The record shows Plaintiff failed to comply with prescribed treatment for diabetes,

27. *Huston v. Bowen*, 838 F.2d 1125, 1132 (10th Cir.1988).

28. *Casias v. Sec'y of HHS*, 933 F.2d 799, 801 (10th Cir.1991).

29. *Hamilton v. Sec'y of HHS*, 961 F.2d 1495, 1499 (10th Cir.1992).

30. *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir.1995); *but, see, Qualls v. Apfel*, 206 F.3d 1368, 1372 (10th Cir.2000) (*Kepler* does not

require formalistic factor-by-factor recitation of evidence).

31. *Kepler,* 68 F.3d at 391 (quoting *Huston,* 838 F.2d at 1133) (footnote omitted).

32. *Castellano v. Sec'y of Health & Human Servs.,* 26 F.3d 1027, 1029 (10th Cir.1994); *Clark v. Chater* 75 F.3d 414, 417 (8th Cir.1996);*Dawkins v. Bowen,* 848 F.2d 1211, 1213 (11th Cir.1988).

despite physician's statements that uncontrolled diabetes would worsen her cardiac condition. Failure to follow prescribed treatment, without good reason, is properly considered when assessing a claimant's credibility.[33]

#### Work History

The ALJ accurately found Plaintiff's work history to be sporadic with below average earnings. Subjective complaints must be evaluated with due consideration for credibility and motivation.[34]

#### Activities

The Court agrees with the ALJ's conclusion that Plaintiff's allegation of disability is inconsistent with her activities of daily living such as cooking daily, going to the food pantry everyday, mopping the floor, watching television, sewing clothes, painting crafts, going shopping, doing housework (except for moving furniture), riding the bus everyday to the food pantry (where she walks half a block uphill daily) and visiting her family in Maryville, Missouri on weekends. Moreover, Plaintiff testified that she lives in a two story house and sleeps on the second floor. Plaintiff's lifestyle, although restricted, is not consistent with total disability.[35]

No doctor ever restricted Plaintiff from all work. In fact, Plaintiff testified that the only restrictions imposed by any physician was a restriction against lifting over

20 pounds and that Plaintiff was advised to exercise and increase her physical activity. The lack of significant restrictions imposed by a treating physician supports an ALJ's finding of no disability.[36]

Although Plaintiff claims the need to nap daily and recline with her feet elevated by pillows twice weekly, she has never informed her physicians of this alleged need. Again, Plaintiff's physicians repeatedly advised her to exercise and increase her physical activity.[37]

The ALJ's credibility findings must be affirmed if they are supported by substantial evidence in the record as a whole.[38] Because the ALJ articulated the inconsistencies upon which he relied in discrediting Plaintiff's subjective complaints, and because those inconsistencies are supported by the record, his credibility finding must be affirmed.

### C. Ability to Perform Other Work in the National Economy

In addition to challenging the ALJ's finding that Plaintiff's testimony regarding the severity of her impairments and/or symptoms were not credible, Plaintiff also asserts the ALJ erred in finding that she has the ability to perform some work in the national economy other than her past work. More specifically, Plaintiff argues

---

33. *See Qualls v. Apfel*, 206 F.3d 1368 (10th Cir.2000); *Holley v. Massanari*, 253 F.3d 1088, 1092 (8th Cir.2001); *Kisling v. Chater*, 105 F.3d 1255, 1257 (8th Cir.1997) (quoting *Roth v. Shalala*, 45 F.3d 279, 282 (8th Cir. 1995)).

34. *Ellison v. Sullivan*, 929 F.2d 534, 537 (10th Cir.1990); *Frey v. Bowen*, 816 F.2d 508, 516 (10th Cir.1987).

35. *See Castellano*, 26 F.3d at 1029; *Koenig v. Chater*, 936 F.Supp. 776 (D.Kan.1996).

36. *Brown v. Chater*, 87 F.3d 963, 965 (8th Cir.1996)

37. *See Brunston v. Shalala*, 945 F.Supp. 198, 202 (W.D.Mo.1996) (the fact that no physician stated plaintiff needed to lie down during day indicated plaintiff was lying down by choice rather than medical necessity); *Schroder v. Sullivan*, 796 F.Supp. 1265, 1270 (W.D.Mo. 1992) (lack of documentation regarding plaintiff's need to nap led court to find plaintiff chose to nap when he could remain awake).

38. *Ellison v. Sullivan*, 929 F.2d 534, 537 (10th Cir.1990).

the ALJ improperly relied upon the responses of the vocational expert to a hypothetical question that did not include

- Plaintiff's alleged need to lie down in excess of an hour for relief of pain and fatigue and elevate her feet at or above waist level; and
- Plaintiff's episodes of chest pain lasting ten minutes or longer causing a lapse in concentration;

Plaintiff goes on to argue that, when the ALJ included these limitations in the hypothetical to the vocational expert, the expert testified that all work would be precluded or significantly compromised.

■ The ALJ's hypothetical question to the vocational expert must reflect with precision all of Plaintiff's impairments that are substantially supported by the record.[39] The ALJ need not, however, include every limitation claimed by Plaintiff, but only those limitations that he/she finds exist based upon substantial evidence in the record.[40] The ALJ determined Plaintiff's claims of disabling limitations in the context of lying down in excess of an hour with elevation of her feet above waist level, as well as claimed episodes of chest pain lasting ten minutes or longer causing a lapse in concentration, were not credible. The Court has affirmed those credibility findings.

The ALJ's hypothetical question to the vocational expert accurately reflected the ALJ's assessment of claimant's impairments and limitations. The hypothetical described a 38 year old person with a 10th grade education who has impairments to include coronary artery disease, an insulin dependent diabetes mellitus with retinopathy, a peripheral neuropathy, hyperten-

sion, lower extremity edema or swelling, status post three angioplasties, a hiatal hernia and headaches. The limitations set forth by the ALJ included a 10 pound lifting restriction; a stooping, twisting, squatting, kneeling, and crawling restriction limited to occasional only; a restriction prohibiting the climbing of ropes, ladders or scaffolds; a restriction prohibiting climbing ramps or stairs more than occasionally; a restriction upon using foot controls repetitively; she should avoid exposure to concentrated heat, humidity or cold, dust, fumes and smoke; she should avoid working at unprotected heights or around hazardous moving machinery; she should be able to change from a seated to standing position every 30 minutes; and she is limited to simple, routine, repetitive work. The ALJ's assessment is supported by substantial evidence in the record. Under these circumstances, the ALJ was under no obligation to describe the additional limitations urged by claimant.[41]

■ Based upon these impairments and resulting limitations given to the vocational expert, the expert testified that, although the claimant could not perform her past relevant work, Plaintiff could perform occupations requiring only sedentary unskilled work. The vocational expert gave a representative sample of such occupations that included surveillance system monitor, telephone solicitor, optical goods assembler and cashier/ticket seller. The ALJ then noted the numbers of jobs cited by the vocational expert for the representative sample, in both the local and national economies, and found them to be significant. The Court finds the ALJ did not err in

---

39. *Decker v. Chater,* 86 F.3d 953, 955 (10th Cir.1996).

40. *Decker,* 86 F.3d at 955; *Hintz v. Chater,* 913 F.Supp. 1486, 1495 (D.Kan.1996).

41. *Decker v. Chater,* 86 F.3d 953, 955 (10th Cir.1996) (stating that, while hypotheticals to the vocational expert must precisely reflect impairments, "they need only reflect impairments and limitations that are borne out by the evidentiary record").

finding Plaintiff has the ability to perform some other work in the national economy.

It is hereby ordered that Plaintiff's Motion for Reversal or Remand (doc. 12) is denied.

IT IS SO ORDERED.